**BERRY v. ROBERTSON, Commissioner of Patents.**

No. 1403.

District Court, D. Maryland.

May 1, 1930.

A. Miller Belfield, of Chicago, Ill., and Semmes, Bowen & Semmes, of Baltimore, Md., for plaintiff.

A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., and T. A. Hostetler and J. F. Mothershead, both of Washington, D. C., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a suit in equity, brought pursuant to the provisions of section 4915 of the Revised Statutes (35 USCA § 63), whereby the plaintiff seeks to establish his right to a patent for a steam drier used in paper

making machinery in connection with the drying and bleaching of the paper. More specifically, the apparatus involves a hollow rotary drier or cylinder over which the paper sheet travels, the interior of the rotary drier or cylinder being constantly supplied with steam to keep the drier or cylinder hot so as to accomplish the drying function. The Berry graphite steam joint, which is the device in issue, represents the connection between the cylinder or drier and the fixed member which forms an inlet for supplying the steam continuously to the rotary part. Between the flat surface of the cylinder or drier and the concave surface of the fixed member forming the steam inlet there is interposed a packing ring, consisting in whole or in part of carbon or graphite, or some composition of one or the other, or some material impregnated with one or the other, the object being to make the joint self-lubricating. It is this lubrication feature which is the primary basis of the alleged invention. The advantages claimed for the device over the prior art are greater durability and economy of operation, through increased saving of oil, steam, and labor; and also increased safety for those connected with its operation.

Plaintiff's application (No. 719,011) embraced fifteen claims, seven of which (6 to 12, inclusive) were allowed by the examiner, and the other eight denied; this denial was sustained on appeal by the Board of Examiners in Chief, by the Commissioner, and finally by the Court of Appeals of the District of Columbia. 58 App. D. C. 234, 26 F.(2d) 1012.

Plaintiff's procedural rights are controlled by section 9 of the Act of February 9, 1893 (27 Stat. 436, 35 USCA § 59), and by section 4915 of the Revised Statutes (35 USCA § 63), as these enactments stood prior to the amendment of March 2, 1927 (44 Stat. 1335, 1336), because at the time that amendment became effective, namely, two months after its approval, the claims here in question were pending in the Patent Office. The proper procedure has been followed, that is, under the given circumstances the plaintiff was compelled to take an appeal to the Court of Appeals of the District of Columbia before he could resort to this court. The Commissioner of Patents has accepted service, so no question arises as to plaintiff's right to sue him in the Maryland district. See Cooper v. Robertson, 38 F.(2d) 852.

Claims 1 and 5, quoted below are sufficiently illustrative of the other six claims

that were rejected, the differences being merely those of description or phraseology:

"1. The combination with a rotary steam drier and an inlet therefor, of a joint between the same comprising a joint device composed in whole or in part of carbon or graphite."

"5. The combination with a rotary steam drier and an inlet therefor of a joint device for said members made in whole or in part of graphite, and spring means tending to exert pressure to produce and maintain a tight joint, said spring means being at the end of the inlet."

The following six references were relied upon both by the Patent Office and the Court of Appeals in holding that all eight claims were anticipated by the prior art: Smith, 1,420,454, application filed June 20, 1922; Emmett, 811,833, application filed February 6, 1906; Getts, 784,785 application filed March 14, 1905; Copeland, 1,329,348, application filed January, 1920; Dodge, 730,-349, application filed June 9, 1903; McLean, 1,082,890, application filed December 30, 1913.

The reasoning adopted by the Patent Office and the Court of Appeals may best be disclosed by quoting the following from the respective opinions:

From the decision of the First Assistant Commissioner of Patents:

"The prior art as disclosed in the patent to Smith shows substantially the identical construction of rotary cylinder and fixed inlet with the steam supply pipe entering the latter and the exhaust or escape pipe passing through the drum and inlet, and packing ring 16 placed in the same relative position between the moving parts as disclosed by the applicant. The packing is not, however, stated to be of the material employed by the applicant but is of some material necessitating outside lubrication. Means for supplying oil to the bearing or joint is disclosed in the patent to Smith. Save for the material of which the packing is formed the construction disclosed by Smith is the same as that of the applicant. The other references, especially Emmett, Dodge and Copeland, show a packing ring of the particular material disclosed by applicant to be old for substantially the same purposes. As noted by the examiners-in-chief, the patent to Dodge discloses a carbon packing employed to make an air-tight joint so as to prevent the escape of steam. The patent to Copeland likewise discloses the packing ring of this same composition. The patent to Em-

mett states that, 'It is found that packing-rings of carbon, usually containing a certain amount of graphite to act as a lubricant, are durable and efficient if the pressure between the surfaces is not too great.' This patent also states that the invention resides in 'means for making a fluid-tight joint at the point where a rotating shaft passes out of a stationary casing containing elastic fluid under pressure.' It is further stated in such patent that, 'The invention is especially useful in packing the shaft of a steam turbine, where the peripheral speed of the shaft is high and the steam-pressure is relatively heavy.'

"It will be noted, in consequence, that it is old to use a packing ring between two relatively rotating surfaces, which ring is of the same material disclosed by applicant, is described as self-lubricating so as to avoid the necessity of additional lubricating means, and enables a steam-tight joint where the pressure is fully equal to that obtained in the applicant's drier to be maintained.

"The applicant has done no more than substitute for the Smith packing ring in the latter's construction of rotary steam drier the old carbon graphite packing ring of Emmett, Dodge, Copeland or McLean. The advantages derived from the substitution are but those already disclosed by Emmett, and the other patentees, as inherent in this kind of a packing ring. It is impossible to predicate invention upon this change or substitution, or hold there was anything unobvious in the change. While claim 3 states the packing has a curved surface which permits angular movement yet this is true of the Smith packing ring. Also Smith discloses the spring means at the end of the inlet recited in claim 5."

From the decision of the Court of Appeals, 58 App. D. C. 234, 26 F.(2d) 1012:

"The patent to Smith discloses the same construction of rotary cylinder and fixed inlet with a packing ring between the moving parts. The packing ring, however, in Smith, is such as to require outside lubrication. Smith's patent discloses means for supplying oil to the bearings. Thus it appears that the only difference between Smith and applicant is the material employed for the packing ring.

"We are of opinion that the alleged invention of applicant is fully and completely anticipated by the prior art. The patents to Emmett, Dodge, and Copeland, show a packing ring of the same material used by applicant; and in the Emmett specification it is stated that 'it is found that packing rings of carbon, usually containing a certain amount of graphite to act as a lubricant, are durable and efficient if the pressure between the surfaces is not too great.' "

The present proceeding is not in the nature of an appeal, but rather a trial de novo, with all the customary power of an equity court to hear the evidence fully and to make its own findings, and therefore we are not restricted to a consideration or review of what the Patent Office and the Court of Appeals found. Butterworth v. U. S., 112 U. S. 50, 5 S. Ct. 25, 28 L. Ed. 656; Cooper v. Robinson, Commissioner, 38 F.(2d) 852, and cases therein cited.

Summarized, the gist of the conclusion of both the Patent Office and the Court of Appeals is that although the plaintiff's device is the first to employ self-lubricating material in this particular art, that is, in rotary driers for paper making apparatus, nevertheless, since the patent to Smith embraces a device of substantially identical construction except that outside lubrication instead of a self-lubricating packing ring is resorted to, and since the use of a self-lubricating carbon or graphite packing ring is disclosed in the different prior art devices, namely, use for an analogous purpose although as part of different devices, plaintiff has done nothing more than substitute an old form of packing ring in an old device, which substitution is not sufficient basis for claiming invention. To this plaintiff replies that there is nothing in the different prior arts that suggests the combination which he, by such substitution, has brought about. Plaintiff's contention is clearly summarized in the following statement contained in his brief: "None of them [the prior art references] show a self-lubricating ring which could be used in the old type structure to produce the Berry structure. Structural changes would have to be made in every one of these prior art packing rings to produce the Berry structure. Moreover, all the prior art shaft bearing sleeves are mounted in metal holders or boxes, the need of which seems to have been generally felt and in many cases expressed because of the particular nature of carbon and graphite materials and the nature of the service required. Thus the thought of the applicant Berry, that the carbon or graphite material could be embodied in a ring which must necessarily be narrow because the drier and inlet must be reasonably close together, and that this narrow ring of such material could be in-

918

terposed without a holder and allowed to float between the inlet and drier and in that condition be subjected to the strong spring pressure necessary to make steam-tight joints for high pressure steam between itself and the drier and inlet, and yet relatively weak enough to provide a safety valve, was nowhere present or suggested in the prior art. What suggestion or teaching there was in the prior art was much more to the effect that the applicant Berry's proposal could not be carried out."

It must be admitted that plaintiff has done more than merely change the material of the ring of the Smith patent. He has made changes in the physical structure of the Smith apparatus. Notably he has omitted the oil cups and oil passages. Assuming without deciding that such changes alone would not be sufficient to overcome the argument of anticipation by the prior art, we will pass to a consideration of whether the substitution of the ring material, that is, of carbon or graphite for steel or brass, has resulted in a patentable device.

It is well settled that the test for a mechanical patent is novelty plus utility, and that substituting one known material in place of another is not invention if the result be merely greater economy or durability of the product. Hotchkiss v. Greenwood, 11 How. 248, 13 L. Ed. 683; Hicks v. Kelsey, 18 Wall. 670, 21 L. Ed. 852; Brown v. District of Columbia, 130 U. S. 87, 9 S. Ct. 437, 32 L. Ed. 863; Jennison-Wright v. Hempy (C. C. A.) 266 F. 372. But where such substitution actually involves a new mode of construction, or of operation, or *evidences its superiority in more efficient action, it may amount to invention.* Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952; Potts v. Creager, 155 U. S. 597, 15 S. Ct. 194, 39 L. Ed. 275; Frost Co. v. Cohn (C. C. A.) 119 F. 505; Rainear v. Western Tube Co. (C. C. A.) 159 F. 431; Westmoreland Specialty Co. v. Hogan (C. C. A.) 167 F. 327; Globe Knitting Works v. Segal (C. C. A.) 248 F. 495; Low v. McMaster (C. C. A.) 266 F. 518; Yablick v. Protecto Safety Appliance Corp. (C. C. A.) 21 F.(2d) 885; Lakewood Engineering Co. v. Walker (C. C. A.) 23 F.(2d) 623. As was said in the Low Case, above cited, which involved a portable, tire vulcanizing device, the essential feature of which was the substitution of a solid for a liquid fuel of the prior art (pages 519–523 of 266 F.):

" * * * The characteristics of the heat producing materials used in the earlier apparatus were such as to make the presence of a pan or other receptacle necessary, because they consisted entirely of liquid fuel, such as oil, gasoline, or methylated spirits. The heat-producing material of the patent is a solid and therefore does not require a pan to hold it. It rests upon the vulcanizing plate and is held there by a pin. If there is invention in the combination of the Miles patent, it is found not in any novel arrangement of elements, but in the substitution of a new fuel as an element of a combination otherwise old. That was the beginning and the end of Miles' achievement. As we regard this to be his sole contribution to the art, we think the one question of the validity of his patent is, in a word, whether the substitution of this fuel for others involves invention.

"On this subject it is the law, that merely to substitute superior for inferior materials, in making one or more or all of the parts of a machine or manufacture, is not invention, although the substitution may be of materials that are both new and useful in high degree. It is also the law, as exceptions to this general rule, that if the substitution involved a new mode of construction; or if it developed new properties and uses of the article made; or where it produces a new mode of operation, or results in a new function; or when it is the first practical success in the art in which the substitution is made; or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 496, 23 L. Ed. 952; Celluloid Mfg. Co. v. Crane Chemical Co. (C. C.) 36 F. 110; Potts v. Creager, 155 U. S. 597, 608, 15 S. Ct. 194, 39 L. Ed. 275; Walker on Patents, §§ 28, 29, 36. * * *

"The patentees here claim no invention as to material but admit using a material well known in many arts. The other patents just cited have to do, not with portable tire vulcanizers, to be used chiefly in emergencies at the roadside, but with vulcanizers employing heat producing media obtainable only from such stationary sources as may be found in garages. We are concerned with portable tire vulcanizers; and so far as we have been shown, the only heat producing materials used in such vulcanizers before Miles were liquid fuel. * * *

"By substituting solid fuel for liquid, Miles did away with the pan or pot and its

heat transferring means, and put his solid fuel in direct contact with the plate to be heated and through which the heat is to be transmitted to the tire. He resorted to a fuel commonly used in Vesuvian matches. Though unknown in this art, it was well known in many, having the characteristics of being self-oxygenating, of smouldering instead of burning with a flame, of burning at once throughout its entire mass, and of burning in any atmosphere without being affected by wind or weather. It can not be blown out. Nothing short of a drenching rain can put it out. Being a fuel, its function, like that of gasoline, was to produce heat; and it produced it in the same way, that is, by ignition; just as the function of the rubber button was to button, and it buttoned in the same way that the metal button did; but like the rubber button, the solid fuel which Miles substituted for the liquid fuel of the art performed not only its normal function but it did something else. It did more than produce heat; it produced it in a way and at a place that brought new results and made new things possible. The Miles' substituted fuel brought heat for the first time in direct contact with the vulcanizing plate of a portable vulcanizing apparatus—a new mode of heat application —and thereby dispensed with the mechanical means of posts, flanges and fins to carry heat from gasoline flame to the place at which it is used. Being solid and composed of known chemicals in variable proportions, Miles' substituted fuel was capable of being made to produce heat of precisely predetermined intensity and duration, thus insuring correct vulcanization in the hands of the inexpert. * * * That this use of the substituted fuel was novel is evidenced by the change from the old to the new, admittedly made by Miles. That it is useful is evidenced by its acceptance by the art and the place it has achieved."

Again, as was said in the Lakewood Engineering Case, above cited, which involved a flexible float for concrete road surfacing, the essential feature of which was the substitution of the so-called flexible "strap" for the rigid bar float and the hand-tool floating of the prior art (pages 623–624 of 23 F.(2d):

"We have little difficulty with the earlier patents and devices which are set up as anticipations or as inconsistent with the existence of any invention in what Walker did. They do not respond to the letter of the claims, because they are not road-surfacing devices; nor to its spirit, because they are in fields too far away.

" * * * Judged by the objective and subjective tests which are applicable, and by which we have been guided as well as may be in other cases, we conclude that the District Judge was right in finding the quality of invention to be present in this conception that the old material could be employed for this new use coupled with the (thereupon) rather obvious mechanical changes which were necessary to make practical the application of the thought." .

Where the question of invention is relatively narrow as it usually is when, as here, the thing done is simple, the result achieved, its recognition by the art, and the demand for it by those who use it, are matters properly to be put in the scale and weighed in favor of invention. The court concludes that both the Patent Office and the Court of Appeals were in error in failing to give full effect to this principle. In this connection much importance is to be attached to the answer to the question whether the prior uses and the present use of the material in question are closely analogous. As a practical matter there is certainly little analogy between rotary driers for paper making machines and steam turbines or refrigerating apparatus. Four of the references embrace steam turbines; one of them, the Copeland patent, embraces refrigerating apparatus; the remaining one, the Smith patent, being the only one that has to do with paper making machinery and that, as we have seen, does not embrace a self-lubricating device.

In contemplation of law, the analogy, in order to preclude patentability, must embrace some reasonable similarity in construction and operation. As was said in Potts v. Creager, supra (pages 606–608 of 155 U. S., 15 S. Ct. 194, 198):

"If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use, particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer. Doubtless, a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device, and, by improvements

thereon, has adapted it to a different industry, may also draw to himself the quality of inventor. If, for instance, a person were to take a coffee-mill and patent it as a mill for grinding spices, the double use would be too manifest for serious argument. So, too, this court has denied invention to one who applied the principle of an ice-cream freezer to the preservation of fish (Brown v. Piper, 91 U. S. 37 [23 L. Ed. 200]); to another who changes the proportions of a refrigerator in such manner as to utilize the descending instead of the ascending current of cold air (Roberts v. Ryer, 91 U. S. 150 [23 L. Ed. 267]); to another who employed an old and well-known method of attaching car trucks to the forward truck of a locomotive engine (Pennsylvania Railroad v. Locomotive Truck Co., 110 U. S. 490, 4 S. Ct. 220, 28 L. Ed. 222); and to still another who placed a dredging screw at the stem instead of the stern of a steamboat (Atlantic Works v. Brady, 107 U. S. 192, 2 S. Ct. 225, 27 L. Ed. 438). In Tucker v. Spalding, 13 Wall. 453 [20 L. Ed. 515], the patent covered the use of movable teeth in saws and saw plates. A prior patent exhibited cutters of the same general form as the saw teeth of the other patent, attachable to a circular disk, and removable as in the other, the purpose of which patent was for the cutting of tongues and grooves, mortises, etc. The court held that if what it actually did was in its nature the same as sawing, and its structure and action suggested to the mind of an ordinarily skillful mechanic this double use, to which it could be adapted without material change, then such adaptation to a new use was not new invention, and was not patentable.

"Upon the other hand, we have recently upheld a patent to one who took a torsional spring, such as had been previously used in clocks, doors, and other articles of domestic furniture, and applied it to telegraph instruments, the application being shown to be wholly new. Western Electric Co. v. La Rue, 139 U. S. 601, 11 S. Ct. 670, 35 L. Ed. 294. So, also, in Crane v. Price, Webster's Pat. Cas. 409, the use of anthracite coal in smelting iron ore was held to be a good invention, inasmuch as it produced a better article of iron at a less expense, although bituminous coal had been previously used for the same purpose. See, also, Steiner v. Heald, 6 Exch. 607.

"Indeed, it often requires as acute a perception of the relations between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo. And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before. The apparent simplicity of a new device oftens leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before. The practiced eye of an ordinary mechanic may be safely trusted to see what ought to be apparent to every one. As was said by Mr. Justice Bradley, in [Webster] Loom Company v. Higgins, 105 U. S. 580, 591 [26 L. Ed. 1177]: 'Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.'" (Italics inserted.)

Similarly, in a decision of the Circuit Court of Appeals for the Fourth Circuit, involving a bottle stopper, the court said: "Where none of the prior inventors exhibits or suggests any co-operation of the elements upon the principle adopted by the patent in suit, or upon any principle adapted to serve the same purpose, the use of the old elements may limit, but cannot defeat, the patent. * * * The finding in the old devices, one portion here, one in another, and so on, should not defeat a patent for the combination; which is only truly anticipated by a prior device having identically the same elements, or their mechanical equivalents, co-operating to produce the same results." Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co., 139 F. 312, 319, 320.

The same general principle which this court was, quite recently, called upon to announce in a case involving a process patent, is applicable here. This court said: "A presumption of invention is not overcome by the fact that an expert may be able to build up the patented process by selecting parts' taken from the prior art. That wisdom which comes after the fact will not be permitted to defeat the claim of him who first fully accomplishes the desired end, be it ever so simple, for in the law of patents it is the last step that wins. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S.

428, 31 S. Ct. 444, 55 L. Ed. 527; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968; Webster Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177." Vortex Mfg. Co. v. Ply-Rite Contracting Co. (D. C.) 33 F.(2d) 302, 308.

Were there any doubt as to the patentability of the device here in issue, the court would be compelled to resolve such doubt in favor of the plaintiff, because of the commercial success of the device, as indicated by testimony which is not contradicted. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Trane Co. v. Nash Engineering Co. (C. C. A.) 25 F.(2d) 267; Thropp's Sons Co. v. Seiberling, 264 U. S. 320, 330, 44 S. Ct. 346, 68 L. Ed. 708; The Black & Decker Mfg. Co. et al. v. Baltimore Truck Tire Service Corp., 40 F.(2d) 910, decided April 8, 1930, by Circuit Court of Appeals, Fourth Circuit. The testimony of the plaintiff and his assignee discloses that during the past three years the Belloit Iron Works has manufactured approximately 2,500 Berry graphite steam joints. The estimated saving accomplished by the average paper making machine equipped with one of these joints is conservatively placed at $10,000 a year. Customers are willing to pay more than three times as much for the new joints as they paid for the old type. Explosions due to excessive internal steam pressure have occurred with the old type, and it is claimed for the Berry joint, with no convincing evidence to the contrary, that such explosions will be prevented because the fitting will give way, due to the relatively weak nature of the carbon or graphite, thereby avoiding damage to the machine, and the consequent monetary damage, and possible personal injury or loss of life.

In conformity with this opinion, a decree will be entered in favor of the plaintiff for all of the eight claims embraced in plaintiff's bill of complaint.