## JUENGST v. HILL PUB. CO.

(District Court, S. D. New York. August 1, 1919.)

1. Patents ☞17—Ability of other inventors in art to make combination does not disprove invention.

The fact that other inventors working in the same art would have been able to make the combination made by patentee does not disprove invention, if the ordinary journeyman in the art could not have made such combination.

2. Patents ☞20—Invention may lie in adaptation of tools of intermittent process to continuous process.

Though the change from an intermittent to a continuous process is not invention, the adaptation of the tools used in the intermittent process to the continuous process may involve invention.

3. Patents ☞241—Adaptation of old tools can be infringed only if same means are used.

Where the invention consists only in the adaptation of tools used in the intermittent process to a continuous process, there can be no infringement, unless the same means are used to accomplish the synchronization of the movements.

4. Patents ☞328—1,193,395, for book binder, held valid, but infringed only as to claim 53.

The Juengst patent, No. 1,193,395, for machines for binding books by continuous process, *held* valid, but infringed only as to claim 53 thereof, relating to a detector to provide against a missing sheet.

In Equity. Suit for infringement of patent by Charles A. Juengst against the Hill Publishing Company. Decree rendered, holding patent valid, but infringed as to only one claim.

Decree affirmed 267 Fed. 435.

Axel V. Beeken, of New York City, for plaintiff.
Donald Campbell, of New York City, for defendant.

LEARNED HAND, District Judge. The machines involved in the patent in suit and the alleged infringement are, exceedingly complicated, as well as are those which preceded them in the art. The claims are, moreover, all in somewhat abstract form, functional in fact, though not on that account necessarily bad, according to existing notions. However, it must be kept in mind that, since there was no invention in the mere idea of a continuously operating coverer, and since on this account the invention must lie in the specific means which the patentee disclosed for accomplishing that general purpose, the claims, to be valid at all, must be read upon the disclosure somewhat narrowly. In other words, the patent cannot be held to include all those means by which the results enumerated in the claims can be accomplished; they must be limited to those means which the patentee disclosed, or which were obvious equivalents, available to the ordinary skilled artisan.

Furthermore, not only was the mere idea of continuous movement not patentable, but the succession of the processes was equally not invention for the art established and required it. There remain open

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for invention only changes in the terminal tools which touch the books and covers; i. e., the actual fingers of the process, and the mechanical connection of the parts, so disposed as to operate synchronously.

[1, 2] As to the last element, the defendant seems to suppose that, having once shown some similarity between the terminal tools and the prior art, all chance for invention disappears. This is not so. It may be that any one of the inventors whose patents fill the record could have successfully co-ordinated these tools; but it certainly does not follow that a journeyman artisan could do so. These men are the pick of their art, presumably, and what may be easy for them might be as impossible for the ordinary artisan as it would be for a layman. Invention may therefore lie in the adaptation of the old intermittent tools to a continuous machine.

[3] It is quite true that, if invention does lie only there, there can be no infringement, unless the same means are used to accomplish the synchronization of the movements. That, however, is only a caution when the issue of infringement arises; it does not affect invention. In such complicated machines as these it is pretty sure that almost any practicable machine, which will work continuously, requires for all its parts some genuine inventive capacity, as that word is understood. The ordinary man might easily imagine the outlines of the result, but the tangled complexities of interaction would be quite without his practical powers. An invention does not call for the genius of a Farraday, a Helmholtz, or a Kelvin; whatever is outside the powers of the ordinary journeyman, once he becomes well grounded in the art, is enough. That is not a high standard of originality.

[4] The first process with which Juengst had to deal was the feeding of his books into the conveyor or belt, in which they were to be held while the bottoms were glued, the covers pressed on, and later "broken," as the word goes; these being the three necessary processes. The Sheridan horizontal machine, though intermittent, had an endless horizontal belt, with two turns and two parallel straight stretches, exactly like the defendant's. It carried clamps, which operated upon the same principle as his; clamps holding the books firmly between two horizontal and immovable pins. The opening mechanism of these clamps is shown in Figure 1 of Bredenberg, 1,073,324, and, while it operates through fingers fixed upon an oscillating shaft, instead of by the cam, *36*, of the defendant's machine, it is to be regarded as in every sense an equivalent. In so far as the patent depends for its in-feed upon its horizontal continuously moving belt with a series of clamps, the infringing machine is derived, not from it, but from the earlier Sheridan machine. Nor can it be thought any invention to keep Sheridan's belt in continuous motion; rather was invention necessary, assuming invention had anything to do with the matter, to stop the belt, so that the intermediate processes should take place.

Juengst's disclosure, in which one side of the clamps swings in a plane perpendicular to the plane of the belt, could introduce the books in the same plane as the belt and parallel in two planes to one of its straight runs. As the clamp pins in the defendant's machine were fixed, the books must be introduced from above or below, and in order

to be continuous this introduction must be gradual, which could not be effected, except by a gradual incline. But Juengst did not need to introduce the books as he disclosed in Figure 1 of the patent. It so happens that the figure shows the books arriving on an endless belt from Juengst's gatherer stitcher. They might equally have come from a platform, where they had been stacked side by side on end, as shown in Lewis. It is quite plain (page 2, lines 89–99) that the patent did not include this delivery from the gatherer stitcher, and that the in-feed does not include it.

The patent can fairly be said to begin with the finger, 28, which picks off the book and carries it until the clamp descends. Whether the in-feed feature is patentable, therefore, depends in my judgment altogether upon the opening of the clamps "at an angle with respect to the advancing movement of the conveyer," as claim 4 puts it. The finger, 28, is not patentable (see Lewis). It is a combination as a whole, which alone could be the basis of a claim. Therefore I do not read the language of the claims, "in substantially the direction of the path of movement of said clamps," as covering the defendant. I do not care whether verbally it answers or not. Mere verbal correspondence will not, of course, prove infringement; there must be functional equivalence. I cannot see that the defendant has borrowed a single element of Juengst's in-feed, and there would indeed be scarcely a plausible argument in its favor, were it not that the figures show a series of single books arriving from the gatherer. I do not, of course, mean to suggest that Juengst's in-feed was not a highly meritorious invention, taking all its coactive elements together.

Coming next to the glue pot and detector, with their attendant mechanism, we find in each the same means; i. e., a glue roller contacting with the bottom of each book as it advances. But this was not new; Lewis shows such a glue roller operating in unison with the movement of the books, and the Sheridan horizontal machine has the same thing. There was no pause at this stage of the operation in either machine. Now there is no need for a detector, where the feed is not sheet by sheet, because with a pile of covers there can be no missing, unless the pile is exhausted, a contingency not probable enough to require provision. It does not require invention merely to think of the necessity for a detector to provide against a missing sheet, and if the mechanism actually employed were at hand to accomplish the result, claim 53 would not be valid. Bascom, a detector for missing sheets in a glueing machine, is such a device, but it corresponds only partially with the device of the patent. Dexter, 602,816, is another, also unlike in structure.

Nor can I say that it required no invention for Juengst to make his detector with either Dexter or Bascom before him. Certainly a valid claim could be made, which would sustain the details of his disclosure in the face of either. Bascom is much closer, but is by no means the same. On the other hand, the differences between the defendant's detector and the plaintiff's are too small to be of any consequence. The defendant's member 227 moves in one direction out of functional connection with the bell crank, 229, and the plaintiff's member 37

moves in the opposite direction, away from its bell crank, *36*. The defendant's glue pot rises and falls like Bascom's, and only the plaintiff's roller.

The infringement and validity of claim 53 therefore depends upon whether I read it to cover any detector, or limit it to substantially the detector actually described. As there appear to be no other claims which define it in detail, I am disposed to adopt a lenient attitude towards the claim, and read it to mean "substantially as described."

The next element is the cover-feeding means. This Juengst disclosed as a roller situated below the line of travel of the books, to which roller sheets were fed singly by belts and chains running below the "breaker" from a single sheet feeder not disclosed. There were a number of such single sheet feeders in the art, and Juengst (page 3, lines 40–43) assumed that any one of them could be used. Certainly his patent cannot stand upon any particular form of single sheet deliverer, and the disclosure (page 3, lines 43–70) concerns only the chains, rollers and belts which carry the sheets up to the roller. In these no invention can rest. The roller rolls the sheets directly upon the back of the freshly glued books. As an alternative, in Figure 17 Juengst disclosed diagrammatically a system by which the single sheets were carried by belts to a table, *182*, which was to press them against the books before they reached the "breaker." In Figure 16 the presser and "breaker" were combined in one.

This disclosure is criticized as insufficient, but I think it was not, Such a table or platen Lewis disclosed fully, though for a pile of sheets a device which involved a very complicated mechanism for compensation as the pile was exhausted. Juengst in this patent had the right to refer to such a table as a part of the art to which builders might refer, and therefore, taken merely as matter of interpretation, and without looking at the prior art, I think that the claims which refer to the cover feeding devices would be sufficient to cover the defendant's structure. It has taken Lewis' table, eliminated the compensating element, and operated it as Juengst did his "breaker" presser, of which more hereafter.

The question of validity is therefore necessarily involved, unless the claim be narrowly construed. Before considering the possibility of so construing the claims, I must ask whether it was invention to combine Lewis' table with the single sheet feeders known in the art. If so, obviously it can be only because of some originality in the idea of serving the machine by single covers instead of by a pile of covers. Both Lewis and Pachter made continuous machines in this respect, and each provided a pile of covers upon a table needing replenishment. It may be plausibly urged that this is some proof of invention. However, the covers must be piled somewhere, either upon the table in the machine, or outside upon some one of the known cover feeders, and the pile must be replenished by hand when exhausted. I own it seems to me hard to believe that the position of that pile was actuated by more than a choice from convenience. Possibly Lewis and Pachter thought it better to have the machine complete within itself than to require a supplementary cover feed. At least the necessary compen-

sation involved highly complicated additions to the table mechanism, which would have suggested its inconvenience.

With every allowance for the fact that the earlier inventors did not disclose the combination, I must hold that the cover feed claimed is not an invention, if construed so broadly as to infringe. In view of this result, and candidly, perhaps at the expense of some logical consistency, I think I shall hold that the claims for cover feed may be narrowly construed in spite of figures 16 and 17. It will follow, however, that these claims are not infringed.

The last element, and the most important, is the cover breaker. Here the two machines separate in their structure. Juengst has a quite separate element from the roller, consisting of a base and two "breaking" jaws. The base rises and presses the cover firmly on the book, and thereafter moves in unison with it till the "breaking" is complete. The forward motion of this presser engages the two breaking jaws with opposing cams, which cause them to approach each other, thus narrowing the space between them, and so "breaking" the cover on the book. After the continued motion of the presser has carried the whole combination beyond the cams, a spring releases the jaws from each other.

The defendant's breaking is accomplished in part by the same presser member, which causes the cover to adhere to the book in the first place. This member is in contact with three books at a time, and with each book three separate times. Having pressed the cover to the book, it drops, returns, and rises again. The same book is then again in contact with it, but not at its rear end as before, but at its center. At that moment, opposed breaking jaws, which are in form precisely like Juengst's, strike it a hard blow in the arcs of circles moving in opposite directions. At the point of contact the edges of the jaws are moving in the same direction as the presser. The blow is very quick and strong, delivered by the rotation of two vertical rods on which the breaking jaws are eccentrically mounted. As the books are loosely bound pamphlets, the strong blow probably sinks a short distance into the paper, and in any event it is in the same direction as the motion of the presser.

That the forward movement with the presser makes a difference appears upon reflection. Were it not so, the jaws could be rotated in the opposite direction, which would certainly in fact prove disastrous; or the device of Sheridan's horizontal machine could be used with an instantaneous blow. It is therefore, in my judgment, no answer to say that, because the arc in which the jaws move is parallel to the presser only at the moment when the motion of the presser is tangential to it, they do not move in unison with the presser. Practically speaking, and not geometrically, there is a functional period during which the two must be moving in substantial unison, else the paper of the cover would be torn or displaced. So much for the actual operation of the defendant's cover breaker.

Is the Juengst breaker valid as invention? The terminal tool, presser, and jaws have been taken directly, so far as I can see, from the Sheridan intermittent machine. The presser and the jaws rise and fall

together, and the jaws slide reciprocally over the face of the presser. Juengst, however, had to do a very difficult thing; i. e., to keep these two relative motions while he gave to them all an added reciprocating movement in the third of all possible geometric normal planes. In doing this he had to abandon altogether the disclosure of the Sheridan machine, and so far as the motions of the presser were concerned he followed Lewis' feed table. However, he had to give the jaws their breaking movement, and this he did by a cam. It may seem simple, after this had been done, to see how it was done; but I have no doubt whatever that it was invention to do so. Bredenberg, admittedly a talented inventor, thought the breaker inoperative when he first saw it, which is ample testimony to its difficulty. The Sheridan breaker is therefore not a good reference.

The next reference is Figures 36 and 37 of Lovell and Bredenburg, which shows a "breaker." This patent discloses a moving chain carrying a series of pairs of relatively movable jaws, designed to press into the edges of a round-backed book the cloth and cotton which is to be a part of the hard cover, later applied. The mechanism is not simple, and, like the details of Juengst's breaker, can hardly be satisfactorily described without figures. "Breaking" results from the fact that the curved jaws, $h^3$, are raised by the contact of the rollers, $J^3$, with the cam track, $Z^3$. As the rollers rise, they bring together the jaws, and, if there be no book between them, the presser, $V^2$, does not rise with them. If, however, the jaws contact with a book, the presser must rise and press against the book.

It is conceded that the jaws contact first, and it follows that there must be a downward thrust from the jaws taken by the ridge of the edge of the book, since the pressure at the bottom is only the reaction from this action. In the case of a pamphlet, which has no such sustaining ridge, there would obviously be a tendency, depending on the pressure desired at the bottom of the pamphlet, to pull off the freshly glued cover from the book, or certainly to put a crease in it at that point. I cannot see that the defendant's modification on plate 16 of Exhibit N could operate without some such tendency, and at least I am not inclined, in view of the inevitable uncertainty of such changes, to accept this "cover breaker," assuming it to be properly called such, as an anticipation of what Juengst devised.

Disclosures like Hull and Lewis and Pachter may be safely disregarded; they are not designed upon the same principle at all, and probably would never operate effectively, as the roller carries a wave or crease before it by the time it reaches the end of its course. They are tacit evidence to the difficulties inherent in the adaptation of the old intermittent breaker to a continuous machine. The device in Juengst's gatherer stitcher had a reciprocating action of the jaws coordinated with a similar reciprocation of the supporting mechanism to enable the book to continue its course while the jaws clamp it. It has no third motion of rise and fall, as the patent in suit. That Juengst borrowed from his gatherer stitcher may be true; I should rather look to the reciprocating tables of Lewis, as I have said. The means chosen by Lewis to give the tables two reciprocating motions were very simi-

lar to those chosen by Juengst in this patent, but the addition of the opening and closing of the jaws I have already said that I thought was not commonplace craftsmanship. Therefore, though the terminal, too, was old, its organization in the machine to perform a three-way motion of the jaws required substantial mechanical ingenuity.

The remaining question is whether the defendant's breaker is an infringement. Verbally I think it is, because it has a motion in unison with the belt. Certainly there can be no doubt that the presser has such a motion. As I have already said, there is also no doubt, practically speaking, as to the jaws. I shall not look closely as to the exact difference in speed between the jaws and the presser. Obviously the jaws, which move in a circle, have at every instant of time a different speed in the direction of the presser. As I have said, the real question is of their substantial unison to do the work. Is there functional, as well as verbal, equivalence? The defendant has not kept the terminal tool of the Sheridan horizontal machine, but modified it by providing for the vertical separation of the jaws from the presser while both are moving backward, and therefore in inoperative phase. The presser is reciprocated up and down and forward and back by substantially the same mechanism as Lewis, and for so much of its machine, therefore, the defendant might safely follow Juengst, as indeed it did. If it infringed at all, it infringed by the means of opening and closing the jaws.

In the form of the terminal tool Juengst made no invention, as I have said. It is clear that to a continuously operating machine it is as necessary that the jaws should move forward when in contact with the book as that the other parts should so move. That conception is merely a statement of the problem before the inventor, not its solution. There is no originality necessary in that. Therefore it can be only in the means by which the forward movement is accomplished that invention may lie. I have already stated what Juengst's means were; the defendant's appear to me toto coelo different. It did not utilize the forward motion of the presser to move the jaws in unison with the book, as did Juengst, nor did it interpose in the path of the jaws a cam through which a resultant force at right angles was developed to close them. It provided, on the contrary, a quite independent source of immediate power for both movements, as well as for the return from each; i. e., the shafts which carry the jaws eccentrically. These shafts were out of all mechanical connection with the presser, and operated without regard to, though synchronously with, its movement.

To conceive and to execute these means required new inventive thought quite as new as the thought necessary to give Juengst's motion to the jaws. It was a departure in which no common element remained between Juengst and the defendant, except the same result. Certainly, if Juengst had been required to state in detail his invention upon this feature, the claim would have so clearly avoided the defendant's structure that noninfringement would have been apparent. It is no doubt true that the cam and the eccentric are oftentimes mechanical equivalents, but it would be absurd to treat all mechanisms as equivalent merely because they contained cams or eccentrics.

In conclusion, therefore, it seems to me that, with the exception of the detector, the defendant has used nothing which Juengst contributed to the art in this patent. Juengst did make the first continuous machine, and he is entitled to a monopoly upon it. I see no reason to question its validity. But the maker of the first continuous machine cannot control all other such machines, unless they have been constructed by borrowing from what the first maker did. Just as Juengst necessarily started with the existing art before him, so all others are free to start where he did. The defendant, starting at the same place, had not needed to use any of the means which Juengst invented except his detector.

I conclude, therefore, that a decree may go on claim 53, and the bill be dismissed for noninfringement upon the other claims. No costs.